Mr. Attaway. Thank you, Your Honor, and may it please the Court. I'm Scott Attaway, representing the plaintiff, Blueberry Farmers, and I'd like to reserve three minutes of my time for rebuttal. That request will be granted. My clients have two primary claims against Novartis for damaging their blueberry crops. First are the product liability claims, which sound in strict liability and negligent testing, alleged in Counts 1 and 2, and second is the statutory New Jersey Consumer Fraud Act claim alleged in Counts 7. The District Court dismissed the product liability claims based on an erroneous finding that Novartis had no duty under state law to ensure that its newly reformulated pesticide product, Diazonon AG-600, was safe for crops when foreseeably tank-mixed with commonly mixed fungicides. As Novartis acknowledges at page 23 of its brief, however, a manufacturer's duty to ensure the safety and efficacy of its products extends to all reasonably foreseeable uses in light of the general experience within the industry. Here, the experience within the industry is that tank-mixing of pesticides and fungicides is a long-standing practice. And the specific tank mix at issue here, Diazonon with CAPTAN or CAPTEC, has long been used without incident by blueberry farmers, as recommended by Rutgers Agricultural Extension Program professors. Moreover, as our expert testified, without rebuttal from Novartis, the fact that Novartis's newly formulated product contained what is known as an ionic surfactant should have been a red flag for mixing incompatibility and crop damage. Because Novartis failed to heed that red flag and either provide a safer product or to warn against tank-mixing, as Novartis subsequently warned in a supplemental label, this Court should remand the product liability claims for trial. The Statutory Consumer Fraud Act claim is based on a Novartis marketing brochure claiming that AG 600 provided better crop safety, equal performance to previous formulations, and those formulations did not cause crop damage when mixed with CAPTAN or CAPTEC. Novartis likewise asserted that AG 600 provided improved safety to plants, quote-unquote, and that users could, quote, expect the same powerful performance as with other formulations, end quote. Those quotes are in the brochure, which begins at A534. What is the evidence of reliance or a causal connection between those brochure comments and the injury that's claimed? First of all, reliance is not required under the New Jersey Consumer Fraud Act. There is a causal nexus requirement, but direct reliance on the brochure is not required, and the District Court erred in that holding. The causal connection is this. Novartis made its claims to the Rutgers scientists and the pesticide retailers who in turn recommended AG 600 to the farmers as Novartis knew and expected they would. The farmers' affidavits are found at page A902 to 950 of the appendix, and they set out the various information that they relied on. There was a twilight meeting that happened on May 21st, which was the primary means for Novartis. Is there any evidence that the people at the twilight meeting, presiding at the twilight meeting, the Rutgers folks, et cetera, relied upon the brochure? Relied upon the brochure? That is at page A966 to 968 in the testimony of Dr. Pallavarapu. Dr. Pallavarapu was the main Rutgers scientist who specialized in blueberries, and he specifically testified that he relied on information from the manufacturer, that he didn't go do his own independent research. He relied on the information from Novartis. The other Rutgers professor, Dr. Pavlis, testified at A960 that he understood that Dr. Pallavarapu also relied on the brochure. In addition, the Novartis product development specialist, Aaron Locker, testified at A736 to 738 that Novartis regularly used the brochures to encourage retailers and extension program folks to recommend their products. What about as to Indian Brand Farms, who purchased the product after the Rutgers meeting? How could you show reliance for that party? I'm assuming, Your Honor, that you're referring to the chart at page 53, I think, of the Novartis brief. And actually, Indian Brands, I think, bought the product before the meeting, and they relied on the recommendation from their pesticide retailers, from Frank Donato and Bill Parkhurst, and that's set out in those affidavits at A902 to 950. I have a preliminary question on reliance. I had trouble finding where you raised that on appeal. As I understand it, it was the alternative holding on your consumer fraud claims that were alleging oral fraud and the brochure-based fraud. The district court first held fee for preemption but then alternatively held no reliance. Where did you raise that on appeal, the reliance argument? We raised it in the statement of issues in our brief, and Novartis relied on the reliance holding, and as we pointed out in our reply brief at 25, the New Jersey Consumer Fraud Act does not require reliance. The statement of facts in our opening brief. Well, you did that on the breach of express warranty, but did you do that with respect to the consumer fraud claims? Can you point that out for me? That's at page 25 of our reply brief, Your Honor. We cite a number of cases under New Jersey law. Well, the reply brief is not good enough. You need to have it in the initial brief. In the initial brief, we set out all the facts showing the reliance and the causal connection in the statement of facts, particularly at page, I believe it was page 5 and page 9, showing the reliance, the chain of causation from the statements by Novartis to the reliance by the Rutgers professors and the pesticide retailers. And that argument was in support of your breach of express warranty. I mean, you made an argument in your initial brief that there was reliance with respect to the breach of express warranty, but you're saying the first time you did that with respect to your consumer fraud claims was in the reply brief? No, I believe we set out the facts for reliance in the factual statement of our brief, and we challenged the district court's order. We set out the causal connection and challenged the district court's order, and in particular on preemption where the court even failed to address the second part of Bates under the fraud claims, where it, I think, misread this panel's previous decision to preclude it from looking at whether the state fraud claims were in addition to or different from FFRA requirements. Here, the fraud claims are based on a duty to tell the truth and not speak falsely. And in the same way, FFRA is based on the same duty. It prohibits labeling statements that are false or misleading in any particular, including a false or misleading statement concerning the efficacy of the pesticide. In your failure to warn claim on labeling, how can you answer the question that it was not in addition to? FFRA prohibits... FFRA provides that a product is misbranded if its label does not contain adequate instructions for use or if its label omits necessary warnings or cautionary statements. That's section 136Q1G of the FFRA statute. Here, the failure to warn claim, which arises under the New Jersey Product Liability Act, similarly prohibits omitting a necessary warning on a product. But how can that not be in addition to? It's parallel. As the Supreme Court in Bates held, state law requirements that are parallel to FFRA requirements are not preempted. So just as a failure to warn claim, or our failure to warn claim alleges a violation of New Jersey state law, in the same way it would violate FFRA's prohibition on misbranding. The only difference is state law provides a remedy, federal law doesn't. But the Supreme Court was clear in Bates that that doesn't matter. State law providing an additional remedy for something that federal law already bans is not a requirement in addition to or different from a FFRA requirement because it doesn't go to the labeling, it goes to the remedy. Does the EPA require, I mean, the rules prohibit inadequate warning, but do the rules and does the EPA require a warning in this kind of situation on the label? The controlling regulation is 158, 40 CFR section 158.400. And there the EPA explains that it's waived all requirements to submit efficacy data to the agency, but manufacturers must still ensure through testing that, quote, his products are efficacious when used in accordance with label directions and commonly accepted pest control practices. Now the EPA, as long ago as 1973, noted that tank mixing of pesticides were common agricultural practices. That's at page A628 of the appendix. And the record is uncontroverted here that tank mixing has long occurred.  Investigating the phytotoxicity of the pesticides as applied to the blueberry farmers' plants noted that those two pesticides had long been mixed. In fact, using them alone... Sir, that was that they had, that the EPA had waived its efficacy jurisdiction and was not regulating in a relevant area. And that's precisely why there's no preemption of state law claims. And that's also why the district court erred in looking to federal law. This court has previously held that the failure to warn claim is a requirement for labeling and left the issue open as to whether the required labeling under state law would be in addition to or different from those required by the subchapter. That's correct. Okay, well, if there is a waiver of regulation and there is no requirement, isn't this additional requirement? No, the parallel, the requirement under federal law is actually in the statute. It is, I read it a moment ago. Your argument is that the statute trumps what the EPA has done. Is that right? If I understand your question correctly and I see my time is up. You go ahead and answer that question. The statute says that if a label omits necessary warnings, there's a violation of FIFRA's misbranding provision. Now, under FIFRA, a manufacturer still has a duty to make a safe product. It's just that Congress decided that the EPA didn't have to look at whether the product was efficacious in terms of the crops as opposed to safe for human exposure. So the EPA still looks at the human aspect, but it doesn't look at property damage claims. And that lack of review doesn't obviate the fact that the statute still prohibits a product from having a falser or a label that omits necessary warnings or cautionary statements. Mixing is not a problem of human safety or environment. In the context of this case, it's not. It conceivably could be, but that has nothing to do with the facts of this case. Okay. Mr. Attaway, we'll have you back on rebuttal. Thank you. Mr. Mandler. Thank you, Your Honor. And may it please the Court, Counsel. My name is John Mandler, and I represent Novartis Crop Protection, Inc. While this case has been litigated extensively for many years, the remaining two issues are straightforward, and they can be disposed of as a matter of New Jersey law without reaching the issue of preemption. And as this Court has held as a general judicial canon, when a matter can be disposed on the alternative state law grounds before reaching the constitutional issues, it should be. And the Court can do so here. First, the plaintiff's only remaining product liability claim is that Novartis should be liable because it failed to test its diazinon AG-600 insecticide for a non-recommended use, a tank mix in combination with a competitor's fungicide. The district court concluded as a matter of New Jersey law that Novartis did not have a duty to test for specific off-label, non-recommended combinations of its products with other pesticides. Second, the plaintiff's only remaining claim under their misrepresentation in New Jersey Consumer Fraud Act theories is that Novartis should be liable for statements made on the brochure, Novartis brochure promoting diazinon AG-600. The district court, as an alternative ruling, correctly concluded as a matter of New Jersey law that the plaintiff's misrepresentation and fraud claims lack the critical causal nexus to satisfy the requirements of New Jersey law. It's undisputed that no plaintiff ever saw the Novartis brochure or that no plaintiff ever saw the Rutgers Blueberry Bulletin where elements of that brochure were allegedly republished prior to the time that they purchased or used the product. Did they not testify that they relied upon the Blueberry Bulletin as well as the meeting? The testimony, which is quoted by the court and is summarized in our brief at note 11 on page 16, was uniformly that the only written material they received was the label. The record is undisputed on that fact. Did they receive the Blueberry Bulletin? While they may be on the mailing list, their testimony was they didn't read, rely on it prior to purchasing or using the diazinon AG-600, which if you look at the dates of it makes sense because it couldn't have been mailed before May 29th. The majority of them had purchased and some of them even applied the product prior to that date. Turning to the product liability claim, as a starting point of the analysis, it's important to note that diazinon AG-600, when used as a standalone product as recommended on the label, on the EPA-approved label, does not cause injury to blueberry crops. That is undisputed. It was found by the district court prior to the last appeal that the product was not defectively designed or inherently dangerous and it was not negligent on the part of Novartis to put it in the stream of commerce. That finding was not appealed and is now law of the case. Instead, the plaintiffs are arguing that Novartis should have tested diazinon AG-600 in combination with any other number of pesticides for use on any of the 62 crops for which the product can be used under any environmental condition across the United States where it's labeled. Well, aren't they saying it's foreseeable? It was known in the industry that the prior iteration of the diazinon was being tank mixed. So, I mean, it seems you can't really argue that there's no subjective foreseeability here, right? Right. But objective foreseeability seems to be the nub of the matter, right? That is the nub. What's your best argument that this was not objectively foreseeable? To the extent it was objectively foreseeable, it's that broad way that Your Honor just framed it and which counsel framed it, which is it was generally known that tank mixes happened in the industry. And that's the limit of objective foreseeability. To the extent that objective foreseeability existed, Novartis warned against it because on the AG-600 label, first, it didn't recommend any combinations, and second, it included the warning that, quote, crop injury, ineffectiveness, or other unintended consequences may result because of such factors such as weather conditions, presence of other materials, or the manner of use or application. So to the extent there was any objective foreseeability of the general question of tank mixing, it was warned against. What plaintiffs are focusing on is their very specific tank mix, and that's when we cross the line to subjective foreseeability. What they're saying is don't worry about all the other possible combinations. You should have tested for my combination, even though that wasn't recommended, my combination of combining it with a fungicide, another manufacturer's fungicide for use on blueberries in New Jersey. That, under this Court's prior ruling in Arcadian and under New Jersey Superior Court's analysis in the Taylor case, that is subjective foreseeability, which cannot form the basis for... I think you have it backwards, with all due respect. Subjective foreseeability, I thought, was what we know is occurring, and what you know is occurring is that tank mixing is occurring. I thought the New Jersey cases said that objective foreseeability requires us to analyze public policy and whether it makes sense, as a matter of fairness in public policy, to put the onus on your client to warn against this, and Arcadia said, yeah, just because people know fertilizer can be used to make bombs doesn't mean that it's objectively reasonable that that be done. Am I missing something? I think we're saying the same thing in two different ways. I mean, I think the way that that policy... I think we're saying the opposite thing. Okay, let me try again then, because that's my mistake, because I believe I was saying what you expressed. The policy question here is addressed by EPA as it applies its waiver, which says that we are not requiring individual pesticide companies to test its product in combination with all the others. Nonetheless, it's reasonable to allow the growers to combine them. It's not against the law to combine them, even if they're not recommended. But to the extent there is that objective foreseeability that you described, that we know it's going to be combined, that is addressed by Novartis in warning in the way that it did in the general fashion on its label. And then as a matter of policy, the EPA has determined it does not make sense to put the onus on the manufacturer to test in every combination. And that's what the district court found, and that was the basis for the ruling on the product's liability side. Okay. So I thought that's what you were going to say before. Your best argument is it's not fair, reasonable to require your client to consider the 3 million potential combinations of all of these various fungicides and all of the insecticides. Yeah. I mean, and that's just it, and that's what the district court found. It's not only fair and reasonable, it's just not possible. I mean, there would never be any new iteration of a product. And this product, it was an improvement over past products when used as recommended as a standalone product. It was water-based and not oil-based. It had a lower environmental impact because of that. Fewer VOCs, volatile organic compounds. It was easier to handle, and it did mix well. It did mix better. This product, as sold in the jug, in the containers, has to be mixed with water before it's applied. It's applied with big rigs that spray it out in a mist, and usually it's a 20 to 1 ratio. It's 20 gallons of water for every container of product. So the prior product was an oil-based. This is a water-based, so it does mix well, as it's required to do under the label, even as a standalone product. Doesn't New Jersey, in cases like this, require risk utility analysis in a defective design case? As to the design of the product itself, I believe that's correct. As to a non-recommended, non-labeled, I think the standard is whether it is objectionably, not subjectively foreseeable. And I think that's the exact standard that the court did, and I think, as Justice Hardiman pointed out,  to put this burden on the manufacturer. Would you address for me the question I posed to your able opposing counsel about reliance? Did they preserve that? The counsel pointed me to page 5 of the initial brief. At first he said it was in the reply brief, then he said it was in the initial brief. I do not believe that, as we pointed out in our brief, that the plaintiffs addressed the alternative finding for the fraud and misrepresentation claims. I think they exclusively examined it under the fifth preemption analysis. Turning to that, our position, Novartis's position, is that that cause of action can and should be addressed as a matter of state law, and what the court found is that there was a mis- But sticking with that a second, then you raised lack of reliance in your brief. And counsel is absolutely correct that under the New Jersey Consumer Fraud Act, it's not a question of reliance, it's a question of causal nexus. What the New Jersey courts have done is they've replaced traditional reliance with two things. There has to be an ascertainable loss, and there has to be a causal connection between the ascertainable loss and the alleged fraudulent statement. By virtue of the way in which you raised it, then to be able to then contain their or provide their counterargument in the reply brief. I do not believe so, no, Your Honor. In any event, regardless of what their argument was in response, it didn't address the issue, which is the district court found that there was a lack of causal nexus between any statements made on the brochure and the decisions by the blueberry farmers to buy and use the product. What's the difference between reliance and causation under New Jersey law? How can you have causation if there is no reliance? I've asked myself the same question, but I've learned to use the phrases that the New Jersey Supreme Court uses, which is ascertainable loss and causation. Many times, to me, they're the two sides of the same coin. The way the district court analyzed it, while it did use the term reliance because, frankly, I think because it was lumping together the traditional common law fraud claim, common law misrepresentation with the New Jersey consumer fraud, and treating them one and the same, where for the common law misrepresentation you do have the element of reliance. So it used that term sort of as a catchphrase to address both reliance on the common law side and ascertainable loss, causal nexus on the New Jersey consumer fraud statutory side. So what's your response? They say they're under New Jersey law, indirect causal or indirect reliance is satisfactory. And you put this brochure out there for, and it was obviously a marketing tool to influence professionals, retailers and academics, et cetera. And the plaintiffs testified that they relied on what they heard from their retailers. Two responses, Your Honor. First, as to anything that the Rutgers University professors did with their brochure, the only evidence in the record is they republished some elements of that in the These plaintiffs never got or saw before they bought or used it. There is no evidence. What about the Twilight meeting, which was before that? There is no evidence in the record that the statements that the plaintiffs are complaining about in the brochure, Better Crop Saving Mix as well, that those statements were conveyed by the Rutgers University professors at the Twilight meeting. They made a recommendation to use Diazin on AG-600, but that could have come from the label or any sources. There is no evidence that they conveyed or somehow re-read the brochure at the Twilight meeting. There is no evidence that any of the plaintiffs received the brochure at the Twilight meeting. Was it even clear anyone from Novartis was there? It seemed like fairly nebulous testimony as to what occurred at that meeting. I think the testimony is for six of the eight, no one could say that Novartis was there. For the other two, it was nebulous. As you said, they may have been there. They may have not, couldn't identify a name, a person. None of the Novartis people testified that they were there, and that's the status of the state record. And even if they, assuming arguendo, someone from Novartis was there, is there any clear evidence as to what they would have said there? There is not. I mean, the district court and the plaintiffs have not challenged. The district court concluded that there is no oral basis for the consumer fraud or misrepresentation claims at all. Doesn't New Jersey recognize an indirect reliance claim? It does, but there still has to be a causal nexus, and the critical missing piece of the causal nexus is that there's no evidence that statements from the brochure were conveyed to the plaintiffs via the folks at Rutgers. Except the testimony that the folks at Rutgers made their recommendations to buy AG-600 on the brochure. But the recommendation just to buy it and use it Right. is not related to what they find fault with with the brochure. To buy it and use it is nothing more than a recommendation that's one and the same with the label, which is. This goes back to the foreseeability issue. It does. It seems to me. It does. I mean, if New Jersey recognizes indirect reliance and the other elements are present, it seems to me that if their recommendation, if the professor's recommendation was based on what's in the brochure, that could constitute indirect reliance. Right, but there's no evidence that their recommendation at the Twilight meeting was based on the brochure. That's my point. Okay. There is. But the brochure said that this product is as effective as our prior products, but it's safer. Which is 100% true because the brochure and the label and everything Novartis ever did recommended it for use alone and not in combination. Now, wait a minute. You're saying your client didn't know and anticipate that farmers would choose to make one application a season rather than three. You don't really think your client thought that. I mean, the testimony here is, well, look, it's a lot cheaper. You know that they're going to mix because it's a lot cheaper if you only have to go over that field once and make an application once as opposed to three times. Right. And when it's anticipated and recommended, manufacturers do that on the label. Many times they do recommend combinations. Then the onus is on them to test the combinations and to make sure that they're safe. But while you know generally that combinations may happen, there's no evidence that Novartis knew that this specific combination was going to happen, and no evidence that it had the duty to test not only this combination but every other possible combination because growers do that. That's what's reflected in PR Notice 82-1, where EPA decided that it was not going to put that burden on manufacturers. And I see my time is up. One other question. You, I guess not entirely surprising to me, began by focusing our attention on the New Jersey law. I presume that that's because you recognize that the trial court addressed only the first step of the Bates test and never really addressed the second step. Is that fair to say? I respectfully disagree, Your Honor. I think the court did address the second prong of Bates. All right. Show us where. Pages 15 to 16 of the 12-2007 order, which is at A-15 to A-17. It looked at the second prong, which is, is it in addition to or different from? And what it found is that the plaintiff's claims would be in addition to or different from because whereas EPA does not require manufacturers to test for and warn about on the label combinations for which they're not making a recommendation, plaintiff, and secondarily, does not require a statement of all inert ingredients, plaintiff's claims would require them to do that. And, Your Honor, if I can just touch on the fit for preemption. The first element, the first prong of it, whether or not it was labeling, the district court took a matter of first impression, both with this court and from the U.S. Supreme Court, and applied what we believe was a reasonable interpretation of the term labeling. Okay. Mr. Mandler, thank you very much. Thank you, Your Honor. Mr. Attaway. Okay. With respect to objective foreseeability, Novartis argues that it's not fair to require them to consider what they call three million conceivable combinations of pesticides and fungicides and insecticides. What that argument ignores is the unrebutted fact here that our experts showed that the new ingredient, the ionic surfactant, had a high probability of mixing incompatibility. And, in fact, Novartis quickly did some testing and within weeks, and Dr. Pulavarapu similarly did testing, and he found within a day that phytotoxicity effects were present. So it wouldn't have been burdensome. Well, it did the – it found it quickly because it tested what combination your client made, right? I mean – That's partly true, but if you look at their – How could they know in advance? I mean, were there 90 or 70 of each fungicide and insecticide? Is that right? The problem here, according to our expert, and Novartis doesn't dispute, they don't have their own expert report on this issue, is the fact that there was an ionic surfactant. And they tested 27 combinations – or they tested diazin on AG600 with 27 other products. In one-third of those, there was mixing incompatibility, and they found it very quickly. And the reason there was such a high rate of mixing incompatibility is because of the nature of this surfactant. So you immediately take the 3 million number down to a very limited set. And if they had done their due diligence and their chemist had figured out that, oh, the ionic surfactant has a high probability of mixing incompatibility, then they could have taken steps to ensure safety before they released the product on the market. But why is that onus on them initially when it's not a product that's specifically intended to be tank-mixed? Because under New Jersey law, a manufacturer has a duty to ensure safety for foreseeable uses. Here, the record is uncontroverted. The EPA found in 1973 that tank mixing was a common agricultural practice. Ten years later, they put out a regulation saying a manufacturer has to ensure safety and efficacy for commonly used – commonly accepted pesticide practices. But it's common that people of ill will use fertilizer to blow things up. But in Arcadian, the New Jersey court said that while that's subjectively foreseeable, most people who read the newspaper or are aware understand that that's subjectively foreseeable, the New Jersey court said that's not objectively foreseeable. I think the court came out correctly in that case. Using fertilizer to make bombs, an act done by terrorists, is far different from hardworking farmers that have been spraying their blueberry crops to make sure that they're effective in the market and they can sell them. They've been doing this for 60 years since the advent of pesticides. It's no secret. All of the Novartis representatives testified that they were aware of tank mixing. The Rutgers professors were aware of it. In one of the blueberry bulletins, that's at – I think it's A-473, they recommend mixing of AG-600 with CAPTAN and CAPTEC in April of 1997. So the next iteration of this product that they come out with, they're going to have to do the 3 million combinations. Because I think the record's undisputed. If you do a combination analysis, there are 3 million potential combinations for tank mixing this product. Before they bring that product to market, they have to do that. Or they could put a warning saying don't mix this with other products. In fact, they could have done that as a practical matter. I don't know what was in Novartis' head, but it stands to reason that a manufacturer, knowing that this is a common practice, has an economic incentive not to put such a warning. Otherwise, they're going to lose sales. Simple as that. So they recommended this for 62 different products. Part of the reason you get to the high number of possibilities is because they recommended it for such a wide use. It's not consistent with New Jersey law or principles of fairness and equity to say that you can put out a product, recommend it for dozens and dozens of uses, and not ensure that the common way that these hardworking farmers put it on, which is mixing. It's safe for all 62 uses. That's undisputed. Not when it's mixed. When it's used alone, when it's used as intended, it's safe for all 62 uses. Why shouldn't they have a right to mention those uses? Because those uses are foreseeable. Subsequently, they put a warning on the label saying don't tank mix this product. And they could have done that sooner. Okay, Mr. Attaway, we thank you. The case was very well argued, and we'll take the matter under advisement.